**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

**JONTERRANCE WINZER**                    **CIVIL ACTION NO. 19-0658**

                                          **SECTION P**

**VS.**

                                          **JUDGE TERRY A. DOUGHTY**

**DARREL VANNOY**                         **MAG. JUDGE KAREN L. HAYES**

<u>**REPORT AND RECOMMENDATION**</u>

Petitioner JonTerrance Winzer, a prisoner in the custody of Louisiana's Department of

Corrections proceeding pro se and in forma pauperis, filed the instant Petition for Writ of Habeas

Corpus under 28 U.S.C. § 2254 on approximately May 22, 2019.  Petitioner attacks his second-

degree murder and armed robbery convictions, as well as the respective life and ninety-nine-year

concurrent sentences imposed by the Third Judicial District Court, Union Parish.[1]  For the

following reasons, the Court should deny the Petition as untimely.

<u>**Background**</u>

On July 25, 2013, a jury found Petitioner guilty of second-degree murder and armed

robbery.  [doc. # 1, p. 1].  Thereafter, the Third Judicial District Court, Union Parish, imposed a

life sentence for second degree murder and a concurrent ninety-nine-year sentence for armed

robbery.  *Id.*

Petitioner appealed, claiming that the evidence introduced at trial was insufficient to

sustain his convictions, that the trial court failed to review his motion to quash and motion for a

continuance, that there was no probable cause to arrest him, that the prosecution withheld

---

[1] This matter has been referred to the undersigned for review, report, and recommendation under
28 U.S.C. § 636 and the standing orders of the Court.

evidence, and that his trial counsel rendered ineffective assistance.  See *State v. Winzer*, 49,316 (La. App. 2 Cir. 10/8/14), 151 So. 3d 135, 148, writ denied, 2014-2373 (La. 4/22/16), 191 So. 3d 1044.  On October 8, 2014, the Louisiana Second Circuit Court of Appeal affirmed Petitioner's convictions and sentences.  *Id.*

On April 22, 2016, the Supreme Court of Louisiana denied Petitioner's Application for Writ of Certiorari and/or Review.  *State v. Winzer*, 2014-2373 (La. 4/22/16), 191 So. 3d 1044. Petitioner did not apply for certiorari before the United States Supreme Court.  [doc. # 1, p. 4].

Petitioner filed an application for post-conviction relief on July 12, 2017.[2]  [doc. #s 1-2, p. 2; 9-3, pp. 4-11].  On July 31, 2017, the trial court denied Petitioner's application.  [doc. # 9-3, p. 36].

On August 30, 2017, Petitioner filed a writ application before the Louisiana Second Circuit Court of Appeal.  *Id.*  On November 15, 2017, the appellate court denied the application. *Id.*  The Supreme Court of Louisiana denied Petitioner's writ application on January 28, 2019. *State v. Winzer*, 2018-0203 (La. 1/28/19), 262 So. 3d 891.

Petitioner filed the instant proceeding on approximately May 22, 2019, claiming that: (1) his appellate counsel rendered ineffective assistance; (2) his trial counsel rendered ineffective assistance; (3) there was no probable cause to arrest him; (4) the trial court failed to review, or conduct a hearing on, his motion for a speedy trial, motion to quash, motion for change of venue, and motion for a continuance; (5) he is actually innocent; (6) the State engaged in prosecutorial misconduct; and (7) the evidence introduced at trial was insufficient to sustain his convictions. [doc. # 1-2].

---

[2] Petitioner also maintains that he filed a "Motion to vacate illegal sentence" and a "Mandamus motion to object to ruling of denial for mandamus."  *Id.* at 3.

**Law and Analysis**

Title 28 U.S.C. § 2244(d)(1) provides a one-year statute of limitations for filing habeas corpus applications by persons in custody pursuant to the judgment of a state court.   The limitation period shall run from the latest of—

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Here, with respect to subsection "C" above, Petitioner's claims do not rely on a constitutional right newly recognized by the United States Supreme Court and made retroactively applicable to cases on collateral review.  With respect to subsection "D," Petitioner does not contend that "the factual predicate of the claim or claims presented" were "discovered through the exercise of due diligence" after the date on which his judgment became final.

Petitioner does not mention subsection "B" or otherwise argue that he was impeded from filing this Petition.[3]  Out of caution, though, the undersigned will examine subsection "B."

Petitioner alleges that he filed a "shell petition" before this Court on January 30, 2019,

---

[3] See *Hebrard v. Day*, 232 F.3d 208 (5th Cir. 2000) ("Hebrard does not argue that a state impediment prevented him from timely filing a § 2254 petition."); *Hatcher v. Quarterman*, 305 F. App'x 195, 196 (5th Cir. 2008) (finding that, because the petitioner "did not allege that the state habeas court created an 'unconstitutional' impediment that prevented him from timely filing his federal habeas application[,] . . . the statutory exception in § 2244(d)(1)(B) [did] not apply.").

requesting an extension of time in which to file his complete petition. [doc. # 1-2, pp. 2-3]. The requirements for the "statutory time-bar reset provision of § 2244(d)(1)(B) . . . are understandably steep." *Wickware v. Thaler*, 404 F. App'x 856, 862 (5th Cir. 2010). To invoke the "reset," a petitioner "must show that: (1) he was prevented from filing a petition (2) by State action (3) in violation of the Constitution or federal law." *Id.*

Here, in the "shell petition,"[4] Petitioner noted that "[h]e has access to the [sic] both the law library and his legal material that has been missing," thus suggesting that he once encountered impediments to filing the instant Petition. [doc. # 13, p. 5]. Petitioner does not specify the legal materials he lacked, who was responsible for the impediment, when the impediments began and ended, or the extent he was impeded. In fact, Petitioner suggests that, as of January 30, 2019, he encountered no impediments. [doc. # 13, p. 5].

Petitioner, ultimately, does not allege or maintain that the impediments he mentions were "created by State action" or, even if they were, that the State action violated "the Constitution or laws of the United States . . . ." 28 U.S.C. §2244(d)(1)(B). Moreover, Petitioner does not definitively contend that the presumed impediments prevented him from filing this Petition.[5]

Consequently, the one-year period of limitation "runs" from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . ." 28 U.S.C. § 2244(d)(1)(A).

---

[4] Below, the undersigned discusses whether Petitioner filed the "shell petition."

[5] See *Cardona v. Davis*, 770 F. App'x 179, 184 (5th Cir. 2019) (examining 2244(d)(1)(B) and concluding, "We find no error in the district court's finding that Cardona's thin account of what was deficient . . . do[es] not establish official impediments to his access to the courts for these 23 months."); *Parker v. Johnson*, 220 F.3d 584 (5th Cir. 2000) (finding, where the petitioner argued "that his alleged lack of access to legal materials . . . extend[ed] the tolling period under 28 U.S.C. § 2244(d)(1)(B)[,]" that the petitioner did not show that "the State imposed an unconstitutional impediment to the filing of his federal habeas petition . . . .").

On April 22, 2016, the Supreme Court of Louisiana denied Petitioner's Application for Writ of Certiorari and/or Review. *State v. Winzer*, 2014-2373 (La. 4/22/16), 191 So. 3d 1044. Under United States Supreme Court Rule 13, "a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment." Here, Petitioner did not apply for certiorari before the United States Supreme Court. [doc. # 1, p. 4]. Thus, the trial court's judgment became final on July 21, 2016, ninety days after the Supreme Court of Louisiana denied Petitioner's application.

Because Petitioner's conviction became final on July 21, 2016, Petitioner had one year, or until July 21, 2017, to file a federal habeas corpus petition. Petitioner did not file the instant Petition until, at the earliest, May 21, 2019.[6] Thus, the one-year limitation period bars Petitioner's claims unless Petitioner extended the July 21, 2017 deadline through statutory or equitable tolling.

**I. <u>Statutory Tolling</u>**

The statutory tolling provision in 28 U.S.C. § 2244(d)(2) provides, "[t]he time during which a properly filed application for State post-conviction or other collateral review . . . is pending shall not be counted toward any period of limitation . . . ." However, any lapse of time before the proper filing of an application for post-conviction relief in state court is counted against the one-year limitations period, *Flanagan v. Johnson*, 154 F.3d 196, 199 n.1 (5th Cir. 1998), and the limitations period is tolled only for as long as the state application remains pending. *Johnson v. Quarterman*, 483 F.3d 278, 285 (5th Cir. 2007).

---

[6] Petitioner signed his memorandum in support of his Petition on May 21, 2019. [doc. # 1-2, p. 35].

Here, Petitioner filed an application for post-conviction relief on July 12, 2017. [doc. #s 1-2, p. 2; 9-3, pp. 4-11]. Thus, 356 days elapsed, from the time Petitioner's conviction became final to the time Petitioner filed his application for post-conviction relief before the state trial court. On July 31, 2017, the trial court denied Petitioner's application. *Id.* On November 15, 2017, the appellate court denied the application. *Id.* The Supreme Court of Louisiana denied Petitioner's writ application on January 28, 2019. *State v. Winzer*, 2018-0203 (La. 1/28/19), 262 So. 3d 891.

Petitioner had 9 days following the Supreme Court of Louisiana's denial on January 28, 2019, to file the instant Petition before the 1-year period of limitation expired. Petitioner, however, allowed 113 days to elapse, following the Supreme Court of Louisiana's denial, before he filed the instant Petition, at the earliest, on May 21, 2019.

Accordingly, the instant Petition is untimely and should be dismissed absent rare and exceptional circumstances.

## II. <u>Equitable Tolling</u>

The one-year statute of limitations can, in rare and exceptional circumstances, be equitably tolled. See *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998). Equitable tolling "applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *U.S. v. Wheaten*, 826 F.3d 843, 851 (5th Cir. 2016). "A petitioner's failure to satisfy the statute of limitations must result from external factors beyond his control; delays of the petitioner's own making do not qualify." *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006). "To be entitled to equitable tolling, [the petitioner] must show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Lawrence v.*

*Fla.*, 549 U.S. 327, 336 (2007) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

Here, Petitioner does not ask the Court to equitably toll the one-year period of limitation. However, as noted, Petitioner alleges that he filed a "shell petition" before this Court on January 30, 2019, requesting an extension of time in which to file his complete petition. [doc. # 1-2, pp. 2-3]. In the undated "shell petition," he wrote:

> Petitioner request that he be provided 120 days extension to perfect his habeas Corpus relief. Petitioner request that he is presently housed at Louisiana State Prison Camp C. He has access to the both the law library and his legal material that has been missing. Petitioner request within the next 120 days will allow him to perfect his habeas Corpus. [sic].

*Id.* To reiterate, Petitioner did not specify the legal materials he lacked, who was responsible for the impediment, when the impediments began and ended, or the extent he was impeded.

For several reasons, Petitioner's "shell petition" does not equitably toll the period of limitation.

### i. Evidence of Filing

First, Petitioner provides no evidence, other than his sworn statement, demonstrating that he filed the "shell petition." Petitioner claims that he filed it on January 30, 2019. However, the undersigned thoroughly searched filings in all federal district courts and did not locate Petitioner's "shell petition."

On April 25, 2019, Petitioner filed a letter, in which he requested "a status check on motion for extension that was submitted to your Court on January 30, 2019." *In Re Jon Terrance Winzer*, 3:19-mc-0028 (W.D. La. 2019). The Clerk of Court docketed the letter in a new, miscellaneous proceeding and then returned the letter to Petitioner, writing:

> On April 25, 2019, the Monroe Division of the Clerk's Office for the Western District of Louisiana received the attached document. After review, it is being returned to you since your submission does not indicate in which case it is to be filed or it includes an incorrect case number. We are unable to determine the

case number from our records. If the document was intended to be filed in a particular case in this court, please resubmit the documents bearing the appropriate case number.

*Id.* at doc. 2. Petitioner responded: "Case History: 3rd Judicial District # 48, 447, 2nd Cir. Court # KH-17-51971, Supreme Court # 2018-KH-0203." *Id.* at doc. 3. Petitioner was presumably referencing his state court proceedings. The Clerk of Court returned Petitioner's response, issuing the same reply set forth above. *Id.* at 4.

It appears that Petitioner either: (1) mistakenly thought he filed a motion for an extension before this Court on January 30, 2019; (2) mailed his motion, but the motion was misplaced before it reached this Court; or (3) considering his state court citations, filed his motion before a state court.

On July 26, 2019, following the undersigned's order to provide a copy of the "shell petition" or other evidence demonstrating that he mailed, delivered to prison officials for mailing, or otherwise filed the "shell petition," Petitioner submitted an "Offender Withdrawal Request," which reveals that, on January 25, 2019, he withdrew $1.00 to mail an item. [doc. # 13, p. 10]. The filing does not demonstrate that Petitioner then mailed a document to this Court or, if he did, that he mailed the "shell petition." *Id.*

**ii. <u>Case or Controversy</u>**

Petitioner submits a sworn statement that he filed the "shell petition" on January 30, 2019, requesting an extension of time. [doc. # 13, pp. 4-8]. Even assuming Petitioner filed the "shell petition," he did not toll the period of limitation because the "shell petition" is not a petition. Rather, it is a motion for extension of time in which to file a petition.

The Court may not *extend* the Congressionally-created statute of limitation at a litigant's

request.  Rather, as explained above, the Court may only *toll*[7]—statutorily or equitably—the statute of limitation.

More important, and again assuming Petitioner filed the "shell petition" on January 30, 2019, he did not present a "case or controversy" under Article III of the United States Constitution.

"It is, however, elementary that, as a predicate to any action before a federal court, parties must establish that they have proper standing to raise a claim. In the absence of a party with sufficient interest, the constitutional limitation of federal court jurisdiction to 'cases or controversies' would prevent a federal court from considering the matter. Standing, therefore, is literally a threshold question for entry into a federal court, limiting the exercise of its jurisdiction, and the court must consider the standing of any party even if the issue has not been raised by the parties to the action."  *United States v. One 18th Century Colombian Monstrance*, 797 F.2d 1370, 1374 (5th Cir. 1986) (internal footnotes removed).

Here, Petitioner attempted to initiate a proceeding by filing a motion for an extension of time.  He did not present claims or assignments of error, he did not identify a respondent, he did not identify the state court that convicted him, and he did not seek any relief.  See RULE 2 OF THE RULES GOVERNING SECTION 2254 CASES (mandating that a petitioner must name a respondent, specify grounds for relief, state the facts supporting each ground, and, inter alia, state the relief requested); 28 U.S.C. § 2242 ("Application for a writ of habeas corpus shall . . . allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known.").

---

[7] See BLACK'S LAW DICTIONARY (11th ed. 2019) (defining toll: "to stop the running of; to abate.").

In his motion, Petitioner essentially asked the Court for an advisory opinion concerning whether the statutory period of limitation would bar a petition that he may (or may not) file or whether the Court would equitably toll the period of limitation on a petition yet to be filed.  See *United States v. Cook*, 795 F.2d 987, 994 (Fed. Cir. 1986) (concluding that a district court's order tolling the statute of limitations was premature because it affected persons who had not filed claims); *Wawak v. Johnson*, 2001 WL 194974, at *1 (N.D. Tex. Feb. 22, 2001), report and recommendation adopted, 2001 WL 290526 (N.D. Tex. Mar. 21, 2001).

"[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.' Its judgments must resolve 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"  *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).  "Federal courts may not give opinions upon moot questions or abstract propositions."  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 365 (5th Cir. 2003) (internal quotation marks and quoted source omitted).

Here, because Petitioner's alleged "shell petition" was not a petition at all and thus did not present a case or controversy, it did not equitably toll the one-year period of limitation.  See *Miller v. Quarterman*, 2007 WL 2890270, at *2 (N.D. Tex. Sept. 27, 2007) (" Insofar as Petitioner requests an extension of the one-year statute of limitations . . . his motion fails to present a case or controversy. . . . There is no statutory or case authority that allows a federal district court to issue a premature order staying the one-year limitations period before a § 2254 petition is filed"); *United States v. Leon*, 203 F.3d 162, 164 (2d Cir. 2000) ("[W]e hold—as

every other court to consider the question thus far has held—that a federal court lacks jurisdiction to consider the timeliness of a § 2255 petition until a petition is actually filed."); *Bryan v. Dretke*, 2006 WL 1004268, at *1 (N.D. Tex. Apr. 14, 2006).

### iii. <u>Extraordinary Circumstances</u>

Finally, even assuming that Petitioner filed the "shell petition," that the "shell petition" was an actual petition, and that Petitioner presented a case or controversy, Petitioner does not present rare and exceptional circumstances. Rare and exceptional circumstances can exist when a petitioner is "actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000) (quotation marks and quoted source omitted).

In his "shell petition," Petitioner mentioned, almost as an afterthought, that as of January 30, 2019, he had access to both a law library and his once-missing legal material. [doc. # 13]. These cursory remarks do not reflect rare and exceptional circumstances. Petitioner did not indicate, for instance, why he lacked legal materials, which legal materials he lacked, how long he lacked legal materials, why he required access to the law library, when he gained access to the law library, or whether the alleged deprivations prevented him from asserting his rights. Moreover, Petitioner did not indicate that respondents actively misled him or prevented him in some extraordinary way from asserting his rights.[8]

---

[8] See *Walck v. Johnson*, 213 F.3d 638 (5th Cir. 2000) (finding that the petitioner did not present rare and exceptional circumstances because the petitioner was "inconsistent with the dates he was denied access to his legal material[,] he [did] not state why he needed his materials to file his federal habeas petition[,] and he [did] not indicate that he was restrained or prevented from filing within the limitations period."); *Caldwell v. Dretke*, 182 F. App'x 346, 347 (5th Cir. 2006) (finding that the district court did not abuse its discretion in denying equitable tolling where the petitioner did not provide "specific evidence of the impact of his medical conditions on his ability to file a timely application [or of] the lack of evidence regarding why certain documents were necessary to the preparation of his application . . . ."); *Tate v. Parker*, 439 F. App'x 375,

11

Even assuming Petitioner presented extraordinary circumstances, Petitioner did not diligently pursue his rights: he waited 356 days, after his conviction became final, to file his application for post-conviction relief before the trial court.[9] See *Webb v. Dretke*, 165 F. App'x 375, 376 (5th Cir. 2006) (holding that the petitioner did not diligently pursue his rights because he "did not seek post-conviction relief until 11 months after his conviction had become final" and offered "no explanation for his delay other than his conclusional allegation that he is a pro se litigant with limited resources.").

Accordingly, this Petition is time-barred under 28 U.S.C. § 2244(d)(1)(A), unless Petitioner demonstrates a fundamental miscarriage of justice.

## III. <u>Fundamental Miscarriage of Justice</u>

In one of his assignments of error, Petitioner argues that two affidavits from his brother, Lonnele Shelton, which are dated approximately three years after his conviction, demonstrate that he is actually innocent. [doc. # 1-2, p. 26].

The Louisiana Second Circuit Court of Appeal summarized the events surrounding Petitioner's crimes thusly:

> On the afternoon of April 26, 2011, police were dispatched to the home of Johnny Ray Simmons in the Sensley's Townhouses in Farmerville, Louisiana.

---

376 (5th Cir. 2011) (finding that "ignorance of the law, lack of knowledge of filing deadlines, a claim of actual innocence, temporary denial of access to research materials or the law library, and inadequacies in the prison law library, are not sufficient to warrant equitable tolling."); *Krause v. Thaler*, 637 F.3d 558, 561 (5th Cir. 2011) ("Krause only alleges that the library at the transfer facility was inadequate. He does not at any point allege facts as to why the transfer facility's lack of legal materials prevented him from filing a timely habeas application."); *Hatcher v. Quarterman*, 305 F. App'x 195, 196 (5th Cir. 2008) ("Hatcher has not shown that not having possession of his trial counsel's file prevented him from filing his application, as opposed to proving his claims.").

[9] "Even when a petitioner demonstrates 'rare and exceptional circumstances' for missing the federal habeas deadline, he also must have pursued his claims diligently to justify equitable tolling of the statute of limitations." *Hill v. Johnson*, 265 F.3d 1059 (5th Cir. 2001).

Upon their entrance into Apartment 26, police discovered the body of Romon Johnson, who had been shot multiple times. Police investigation revealed the Johnson had been shot as he sold one-half pound of marijuana to Simmons and Nicholas Higgins. It was also learned that 24–year–old Jonterrance Winzer, his 16–year–old brother, Lonnele Shelton, and Meagan Ward had spent the previous night at Simmons' apartment and were present during, but not privy to, the sale. Simmons' girlfriend, Ladrina Gray, her niece, Gerreal Gray, and Simmons' nine-month old daughter were also in the apartment at the time of the shooting.

Police ascertained that Winzer and Simmons were childhood friends. On April 25, after a chance meeting with Simmons, Winzer came by his friend's apartment with his girlfriend and little brother and played dominoes late into the evening. The three ultimately spent the night at Simmons' home.

Police questioned all individuals present in the apartment at the time of the shooting. Those interviews resulted in Winzer and his brother being implicated as the shooters. Arrest warrants were issued for the two brothers who were ultimately apprehended and arrested in Oklahoma City, Oklahoma.

*Winzer*, 151 So. 3d at 138.

In his direct appeal, Petitioner argued that the evidence presented at trial did not sufficiently establish that he shot the victim. *Id.* The Second Circuit summarized the evidence as follows:

Dr. Peretti testified that Johnson suffered from three gunshot wounds: one to his right eyelid, one in the back of his neck, and one to his right cheek. In Dr. Peretti's opinion, the right eyelid wound was the fatal shot. He recovered a "small-caliber, non-jacketed bullets, .22's."

Both Simmons and Higgins testified. Simmons testified that he and Winzer grew up together. The two had seen each other the day before the incident and Winzer, Ward and Shelton spent the night at his apartment. On the morning of the incident, Higgins called Simmons to set up a purchase of marijuana with an individual named Johnson, whom Simmons did not know. Simmons recalled that in the late morning, Gerreal Gray arrived at the apartment after getting out of school. She was the niece of Simmons' girlfriend, Ladrina Gray, who also lived in the apartment with the couple's nine-month old baby. Higgins also arrived.

Near lunchtime, Simmons, Winzer, Shelton and Higgins left the residence to obtain food for everyone. Upon their return, Simmons testified that he and Higgins discussed the marijuana purchase and pooled $310. Simmons stated that although the two were originally going to Johnson's residence, ultimately

Johnson came to Simmons' home. After entering the apartment, Johnson went to the kitchen to join Simmons and Higgins. According to Simmons, it was Higgins who gave Johnson the money for the one-half pound of marijuana contained in a plastic bag. As Johnson counted the money, Simmons smelled the "weed" to "see what grade I got." Simmons claimed that immediately after the sale, he went to the bathroom and closed the door. As he came out of the bathroom, Simmons saw Shelton standing in front of the dishwasher in the kitchen. Simmons observed "[Shelton's] hand up and I saw him with the pistol and he shot. That's when he shot [Johnson]."

Simmons stated that Shelton shot Johnson from behind. He saw the victim fall to the ground. Simmons testified that he went back into the bathroom "soon as he shot [Johnson]." Simmons testified that after he went back into the bathroom, he heard "scuffling and stuff going on." He peeked out of the door and saw "Winzer, Shelton and Higgins by the front door." Simmons testified that he guessed "they were jumping on him at the time." He heard another shot and then everything "calmed down." Simmons testified that he "looked back out" and saw Shelton and Higgins "moving toward the table part." As Simmons left the bathroom and ran upstairs, he saw Winzer "picking up the money." Although he only "caught a glimpse" of Winzer, he was "arm distance" from him and "went right by him" as he ran up the stairs. Simmons recalled that he heard what sounded "like two more gun shots" while upstairs. Simmons also recalled hearing a knock at the front door and "running up my steps." He feared for the safety of his girlfriend and daughter and came out of the bedroom. He saw Higgins, Shelton and Winzer "running out the door at the time." Simmons stated that he then came downstairs and opened the screen door for police. He saw Johnson "laying down there," and the bag of money and marijuana were gone.

On cross-examination, Simmons admitted that he pled guilty to accessory after the fact to second degree murder and armed robbery. He also acknowledged that he initially told the police he was upstairs the entire time and did not see who shot Johnson but later gave a second statement in which he admitted being downstairs. He also stated that Winzer and Shelton had no part of the marijuana sale.

Higgins testified that after he got out of classes about 11:15 a.m. on April 26, 2011, he walked to Simmons' apartment. When he got there, he and Simmons "started negotiating about some marijuana" they were going to buy from Higgins' friend Johnson. Higgins corroborated that he, Simmons, Winzer and Shelton got food for everyone in the apartment. They traveled in Winzer's black truck. He testified that he had never seen Winzer or Shelton before that day. He also stated that as they ate lunch, he and Simmons discussed the drug deal in the kitchen. As they did so, Johnson called Higgins and told him he was on his way to Simmons' apartment. When Johnson knocked on the door, Higgins let him in and the two walked into the kitchen area. According to Higgins, Johnson pulled out the seven ounces of marijuana packaged in a plastic bag. Johnson placed the

marijuana on the counter and Higgins gave him the money. Higgins testified that as Johnson counted the money, Shelton came behind him and shot him once. Johnson fell down and Higgins "went up to Lonnele Shelton," and "tried to take the gun from him."

Higgins testified that as the two were "wrestling over the gun," he "slipped down" and Winzer "came over there with a mop stick," and "started beating me with it." Higgins recalled that the three were in the kitchen entrance during these events. Higgins testified that Winzer pulled him toward the kitchen area and Shelton "came through and hit me with the gun." Shelton told Higgins to be quiet and not move. Eventually Shelton made him "get up and move" near a table. Higgins testified that Shelton held him at gunpoint. During these events, Higgins heard Winzer state, "he's still moving." Higgins stated that he saw Winzer get "the gun from his brother," and "went and shot [Romon Johnson] two more times." Shelton remained in Higgins' "eyesight" and stated he knew Shelton did not shoot Johnson. He did not see where Winzer shot Johnson. Higgins testified that after Winzer shot Johnson, "he gave the gun back to his little brother, Lonnele Shelton." Shelton held Higgins at gunpoint, "talking about what he going to do with me." Higgins recalled seeing Shelton picking up the money, but he did not see anyone pick up the marijuana. Higgins remembered that the two brothers discussed what they were going to do with Johnson's body.

Higgins testified that someone came to the front door and Winzer and Shelton ran upstairs. It was then that Higgins ran outside and informed Johnson's family that he had been shot. He went back to Simmons' apartment with Johnson's brother and mother. When he got back to the apartment, Winzer, Shelton and Warden were gone. The money and marijuana were also gone. Higgins suffered a nose injury and swelling from being hit with the gun and broom handle.

On cross-examination, Higgins admitted that he initially told police that after the first shot, he blacked out. He explained that he meant he was "scared a lot," by seeing "somebody die right in front of your eyes." He did not believe that those feelings affected what he saw. Higgins admitted that in 2012, he pled guilty to attempted possession of marijuana.

Gearrel Gray testified that she was in the apartment at the time of the incident. She recalled that as she entered the apartment, Winzer, Shelton and Warden were seated at a table. Higgins also arrived at the apartment about five minutes after she got there. Gray testified that she ate her lunch on a small couch. She stated that Higgins was in the kitchen "counting money" and she heard him "call somebody up on the phone telling him how to get to the apartment." Johnson came to the apartment and went into the kitchen with Higgins. She heard and saw nothing of what transpired between the two men until she heard two gunshots "back towards the kitchen." She got behind the couch and observed what she saw by looking around the couch. Gray did not see who fired the shots, but turned around to see "the younger one" fighting Higgins. She thought that

Higgins was "trying to fight the gun out his hand while he's beating him up." Gray testified that she heard Shelton tell Higgins that he talked too much. Higgins was "hollering and kicking both of them." After that she heard two or three more gunshots and Shelton instruct Winzer to "get the money." Gray also heard Shelton and Winzer discuss where they were going to take the body. Gray testified that she never saw a gun. She stated that when somebody knocked on the door, Shelton and Winzer ran upstairs and Higgins ran out of the house. Thereafter, Gray stated that Shelton and Winzer also ran out of the house with Warden.[10]

On cross-examination, Gray confirmed that she did not see who fired the two gunshots and did not see any marijuana or money.

Warden corroborated the events leading up to the shooting. She witnessed Johnson enter the apartment and go into the kitchen. She saw only Higgins in the kitchen with Johnson and did not hear anything they said. She "knew what they were doing" but did not see marijuana or money. Warden testified that Higgins and Johnson were standing very close to one another. As she sat at the dining room table eating, Warden heard gunshots; she did not see who fired them. According to Warden, at the time of the gunshots, Winzer and Shelton were standing "around the kitchen door area." Johnson was "around the counter part." After she heard the shot, Warden got down on the floor in front of the large couch. She then heard "tussling, the moving around." Warden testified that it was "Jonterrance and Lonnele and Nick" involved in the tussling around the front door area. Warden stated that the three "wound up at the table that I was originally sitting at." Higgins was on one side and Winzer and Shelton were on the other. She heard somebody yelling at Higgins to "shut up and sit down." Warden recalled Winzer saying that "he's still moving," and then she heard more gunshots. She did not see who fired the shots. She saw Shelton holding a very small handgun toward Higgins. She had seen Winzer holding the gun prior to that day. Warden testified that she heard Winzer and Shelton "trying to figure out what to do with the body." Warden recalled that Winzer and Shelton went "upstairs for a while," when there was a knock at the door. At that time, Higgins "ran out the door." Winzer and Shelton then came downstairs and yelled at her to follow them. The three got into the truck and Winzer drove. Warden sat in the passenger seat and Shelton was in the back. The three traveled toward Bernice, Louisiana, and made a detour on a dirt road. Warden heard Shelton and Winzer discuss what happened. Winzer said that Johnson "must've had an angel watching over him because it took more than one shot." Warden saw that Winzer had money "popping out his pocket." She had given him $20 or $30 the night

---

[10] JaMarkus Hamilton testified that as he rang Simmons' doorbell on April 26, 2011, Higgins ran out telling them to go; Higgins' lip was bloody. Hamilton and another man hid behind the building and saw two males and a female exit the apartment. He was not able to identify Winzer as one of those males. Hamilton further testified that the three individuals got into a black truck and headed west after backing into the building and damaging the bumper.

before; she did not know how much he had left. Winzer and Shelton discussed the fact that Shelton had "missed Nick." The brothers dropped Warden off at her apartment; this was the last time she saw either of them.

On cross-examination, Warden testified that she did not "really" change her statements to police, although she "added some that I didn't say the very first time." She admitted pleading guilty to accessory after the fact to second degree murder, armed robbery and resisting an officer, and was awaiting sentencing. Warden admitted that the only person she saw with a gun in his hand was Shelton.

Police testimony showed that the Farmerville Police Department was dispatched to Simmons' apartment around 2:00 p.m. The scene was photographed and evidence collected, but no money, handguns or marijuana were found, except a small bag of marijuana recovered from a drawer in the kitchen. The black truck was later found and searched but it did not contain the gun, the marijuana or the money. Police received an anonymous tip that Winzer and Shelton were possibly in Oklahoma City, where they were subsequently arrested and extradited to Louisiana.

Winzer invoked his Fifth Amendment right to not testify. The defense did not present any witnesses.

*Id.* (footnotes in original).

Here, Lonnele Shelton first avers:

JonTerrance Winzer didn't know what was going to happen. Johnny Simmons told me to shoot Raymond Johnson "we we." That was Johnny Simmons gun. I gave Johnny Simmons the money, weed & the gun & when Gearral "Ge Ge" Gray left the scene of the crime with her mother Courtney Gray they left to hide the drugs money & gun. JonTerrance Winzer didn't know this was going to happen & I don't believe that JonTerrance Winzer knew what happen to the evidence from the crime scene. [sic].

[doc. # 8, p. 115]. In another affidavit, Shelton avers:

On April 26, 2011, I Lonnele Jamal Shelton B/M, DOB 12/18/94, did shoot and kill Ra'mon Johnson, inflicting three (3) shots from a .22 caliber belonging to Johnny Simmons to Johnson's neck, right cheek, and right eye. I Lonnel Jamal Shelton clarify that my brother, JonTerrance did not know that Johnny Simmons told me to kill Ra'mon Johnson and to give him the marijuana and gun so he could make his extra money from the marijuana sales profits. I Lonnel Jamal Shelton, also admits that I robbed Johnson for the $210. It was not $310 like the witnesses testified as. [sic].

17

> My brother, JonTerrance Winzer is guilty of helping get Nicholas "Nick" Higgins off me when we were fighting over the gun; driving me away from the crime scene, and taking me to Oklahoma City to drop me off, but me and my brother both was arrested in Oklahoma City.  I Lonelle Jamal Shelton stated Johnson is still moving and shot him two more times in the face. [sic].

*Id.* at 118.

"Under the fundamental miscarriage of justice exception, a claim of actual innocence, if proven, allows a first-time federal habeas applicant to overcome the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1)." *Tyler v. Davis*, 768 F. App'x 264, 265 (5th Cir. 2019) (citing *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)).  "To be credible, [an actual innocence] claim requires [the applicant] to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  "Tenable actual innocence claims are rare because the applicant must show 'that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *Davis*, 768 F. App'x at 265 (quoting *Perkins*, 569 U.S. at 386).

"To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  "The habeas court must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.* (quotation marks and source omitted).

"'The Supreme Court has not explicitly defined what constitutes 'new reliable evidence' under the *Schlup* actual-innocence standard.'" *Id.* (quoting *Hancock v. Davis*, 906 F.3d 387, 389

(5th Cir. 2018)).  The United States Court of Appeals, Fifth Circuit has "'yet to weigh in on the circuit split concerning'" whether the new evidence must be "'newly discovered, previously unavailable evidence, or, instead, evidence that was available but not presented at trial.'"  *Id.* (quoting *Hancock*, 906 F.3d at n.1).  That said, "Evidence does not qualify as 'new' under the *Schlup* actual-innocence standard if 'it was always within the reach of [petitioner's] personal knowledge or reasonable investigation.'"  *Hancock*, 906 F.3d at 390 (quoting *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)).

Here, the information in Shelton's affidavits is not "new" because it was always within the reach of Petitioner's personal knowledge.  Petitioner was present at the crimes; consequently, he always knew who robbed and shot the victim.  See *Davis*, 768 F. App'x at 265 (finding that evidence was not new because the petitioner acknowledged that the "information" in the affidavits—as opposed to the affidavits themselves—was "known by and available to him and trial counsel at or before trial."); *Moore*, 534 F.3d at 465 (noting that the "information" in the petitioner's proffered affidavit was not "new" because it was "always available" to petitioner, it addressed "matters which, by their very nature, were within the personal knowledge of the petitioner," and it was "always within the reach of [the petitioner's] personal knowledge or reasonable investigation . . . .").  Moreover, Petitioner does not contend that the affidavits were unavailable at or before trial.  See *Hancock*, 906 F.3d at 390 (finding that evidence was not "new" because, in part, the petitioner did not "contend . . . that the affidavits were unavailable to him or trial counsel at or before trial.").

Even assuming Shelton's affidavits constitute "new" evidence, they are not reliable enough for the undersigned to conclude that it is more likely than not that that no juror viewing the affidavits would have, acting reasonably, found Petitioner guilty beyond a reasonable doubt.

First, Petitioner does not explain why the affidavits are dated approximately three years after his conviction.[11]  Second, Shelton is Petitioner's brother.[12]  Third, Shelton pled guilty to manslaughter and armed robbery following the same events for which the jury convicted Petitioner.  *State v. Shelton*, 50,318 (La. App. 2 Cir. 2/24/16), 188 So. 3d 304, 306.  Notably, Shelton did not plead guilty to second-degree murder, the crime for which he was initially indicted, yet now he essentially confesses to murder.[13]

Further, one witness, Higgins, testified that he saw Petitioner shoot the victim twice.  See *Winzer*, 151 So. 3d at 140.  Another witness, Simmons, testified that Petitioner "pick[ed] up the money."  *Id.* at 139.  A third witness, Warden, testified that she observed money "popping out [of Petitioner's] pocket."  *Id.* at 142.   To be sure, each witness's credibility was, like Shelton's, questionable.  Adding Shelton's affidavits to the admissible evidence could permit a reasonable juror to reasonably doubt Petitioner's guilt, but doing so does not make it more likely than not that no reasonable juror would have convicted Petitioner.

---

[11] Courts "may consider how the submission's timing and the affiants' likely credibility bear on the probable reliability of that evidence."  *Schlup*, 513 U.S. at 300.

[12] See *Craig v. Coleman*, 2018 WL 5281956, at *2 (6th Cir. Apr. 18, 2018) ("However, affidavits of family members created well after trial are of questionable reliability and fall short of the extraordinary showing necessary to establish actual innocence.").

[13] See *Milton v. Sec'y, Dep't of Corr.*, 347 F. App'x 528, 531 (11th Cir. 2009) (affirming that the petitioner did not demonstrate actual innocence because the "affiants were aware of the alleged facts to which they now attest[,]" the petitioner did not provide a "reasonable explanation for" the ten-year delay, and some of the affiants' credibility was questionable because they were related to the petitioner); *Whitebird v. Snider*, 28 F. App'x 783, 786 (10th Cir. 2001) (affirming that an affidavit from another who pled guilty based on the same events and who averred that the petitioner was not involved was not enough to demonstrate actual innocence; *McCray v. Vasbinder*, 499 F.3d 568 (6th Cir. 2007) (finding that affidavits from the petitioner's family were insufficient, considering that the family members had a personal stake in exonerating petitioner and that they provided no explanation for waiting five years to come forward); *Gomez v. Jaimet*, 350 F.3d 673, 679-81 (7th Cir. 2003) (holding that statements from petitioner's co-defendants were "insufficient to warrant applying the 'extremely rare' actual innocence exception.").

Accordingly, Petitioner has not established a "credible gateway claim" sufficient to overcome the one-year period of limitation.

<u>Conclusion</u>

For the reasons above, **IT IS RECOMMENDED** that Petitioner JonTerrance Winzer's Petition for Writ of Habeas Corpus, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE** as time-barred under 28 U.S.C. § 2244(d).

**By this Report and Recommendation, the Court notifies Petitioner that his claims are subject to dismissal as untimely under the one-year period of limitation and that the undersigned is recommending dismissal without ordering Respondents to answer. <u>Petitioner may raise any arguments, or present any evidence, against dismissal during the fourteen-day objection period described below.</u>[14]**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Report and Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before the Judge makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

---

[14] See *Lewis v. Cockrell*, 33 F. App'x 704 (5th Cir. 2002) ("When a federal district court applies the limitations period *sua sponte,* it should consider whether the habeas petitioner has been given notice of the issue, whether the petitioner has had a reasonable opportunity to argue against dismissal, and whether the state has intentionally waived the defense.").

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this  6th  day of August, 2019.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE